# EXHIBIT C

Electronically Filed
10/2/2020 2:43 PM
Steven D. Grierson
CLERK OF THE COURT

THE O'MARA LAW FIRM, P.C.
David C. O'Mara, Esq.  (NV Bar 08599)
311 E. Liberty Street
Reno, Nevada 89501
Tel: 775.323.1321
Fax: 775.323.4082
david@omaralaw.net

*Attorney for Plaintiff*

(Additional Counsel on Signature Page)

CASE NO: A-20-822393-B
Department 11

**IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
**IN AND FOR THE COUNTY OF CLARK**

| | |
|---|---|
| ZHONG HAO FENG, BRIAN BURWELL, NELLAI CHOCKALINGAM, and BONMERC UG & CO. KG, individually and on behalf of all others similarly situated, | Case No. _____<br>Dept No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| JIE HAN, XD. ENGINEERING PLASTICS COMPANY LIMITED, FAITH ABUNDANT LIMITED, FAITH DAWN LIMITED, FAITH HORIZON INC., TAYLOR ZHANG, HUIYI CHEN, GUANBAO HUANG, and LINYUAN ZHAI, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

1

CLASS ACTION COMPLAINT

Plaintiffs Zhong Hao Feng, Brian Burwell, and Bonmerc UG & Co. KG (together, "Plaintiffs"), by and through their undersigned counsel, allege with respect to themselves upon personal knowledge, and with respect to all other matters upon information and belief based on the investigation conducted by Plaintiffs' counsel.

## NATURE OF THE ACTION

1.      This class action arises out of the proposed management-led buyout (the "Buyout") of China XD Plastics Company Limited ("China XD" or the "Company") by the Company's founder, Chairman, CEO, and controlling stockholder, Jie Han ("Han"), and certain affiliated entities (together with Han, the "Buyer Group").[1] The Buyer Group and the rest of China XD's Board of Directors (the "Board," and with the Buyer Group, "Defendants") breached their fiduciary duties to China XD's public stockholders by agreeing to sell the Company for an inadequate $1.20 per share following a short, conflict-laden process. Defendants further breached their duties by causing China XD to solicit stockholder approval for the Buyout through a materially false and misleading proxy statement filed with the U.S. Securities and Exchange Commission (the "SEC") on September 30, 2020 (the "Proxy"), which scheduled a vote on the deal for November 4, 2020.[2]

2.      China XD is a China-based Nevada corporation that makes and sells plastics primarily for automotive applications. Recently, the Company has embarked on an aggressive expansion into other sectors, including biodegradable plastics, 3D printing, and personal protection equipment ("PPE"). Han has controlled the Company since its inception, directly or indirectly owning 50.1% of the Company's shares and 69.6% of its voting power, and he has served as the Company's Chairman and CEO for more than a decade.

3.      After taking China XD public in 2009 through a reverse merger, Han has long wanted to consolidate his control over the Company by taking it private again. He tried but failed a few years ago, after which he worked to reconstitute the Board with new directors. When the global

---

[1] The Buyer Group includes XD. Engineering Plastics Company Limited (the "Han SPV"), Faith Abundant Limited ("Holdco"), Faith Dawn Limited ("Parent"), and Faith Horizon Inc. ("Merger Sub"), all of which Han directly or indirectly owns.

[2] On September 30, 2020, the Company also filed a transaction statement on a Schedule 13E-3.

CLASS ACTION COMPLAINT

1  COVID-19 pandemic struck, triggering a temporary decline in stock prices worldwide, Han seized

2  on the opportunity to acquire complete control of China XD at a bargain basement price.

3        4.      In May 2020, Han submitted an offer to the Board to buy the rest of the Company

4  (*i.e.*, the shares he didn't already own) for $1.10 per share. The Board responded by forming a special

5  committee to evaluate the offer (the "Committee"), which in turn engaged Duff & Phelps, LLC

6  ("Duff") as its financial advisor. Over the next month—without contacting any other potential buyers

7  and relying on unreliable financial analyses that incorporated Company forecasts created by the

8  conflicted Buyer Group itself (the "Buyout Projections")—the Committee and Duff worked with

9  Han to finalize the Buyout. In acquiescing to Han's demands, the Committee failed to secure a

10  "majority of the minority" voting condition, which would have allowed the Company's independent

11  shareholders a meaningful voice in voting on the Buyout. The swift, single-bidder, and one-sided

12  process was fatally deficient and did not maximize shareholder value.

13        5.      On June 15, 2020, China XD, Parent, and Merger Sub entered into an agreement and

14  plan of merger (the "Merger Agreement"), under which the Buyer Group, through Parent and Merger

15  Sub, will acquire all of the outstanding shares of China XD common stock for $1.20 per share, or a

16  total of approximately $40.6 million, which represents a slight increase over the original offer price

17  but is still a fraction of the Company's true worth.

18        6.      As Han wrests control of the Company, Plaintiffs and all other China XD

19  shareholders stand to lose their stakes in the Company for grossly inadequate consideration. Among

20  other things, the Buyout values the Company at less than 10% its net book value of $12.41 per share.

21  The Buyout price also fails to account for a $62.8 million receivable from a long-time customer

22  which China XD listed as a "doubtful account[]" but fully expects to receive, according to

23  admissions on earnings calls. Moreover, the Buyout fails to account for Han's persistent efforts over

24  the past few months to diminish China XD's apparent value through a series of sham equity

25  investment transactions involving the Company's two most important subsidiaries. Further, contrary

26  to the analyses Duff performed using the misleading Buyout Projections, the $1.20 per share ignores

27  the fact that China XD has successfully weathered the COVID-19 pandemic, recently invested

28

CLASS ACTION COMPLAINT

significant resources to optimize its manufacturing facilities, and expanded its reach to higher margin automobile products and beyond the automobile sector into other growth industries. Despite the numerous factors demonstrating the Buyout's inadequacy, China XD shareholders have limited recourse given the lack of appraisal rights.

7.     The Buyout is contingent on, among other things, the affirmative vote by a majority of the Company's shares. However, given the Board's failure to negotiate for a "majority of the minority" voting condition, Han's Buyer Group can leverage its majority control to force through the Buyout regardless of how many other China XD shareholders oppose the deal. Nevertheless, in soliciting shareholder approval of the Buyout, Defendants caused the Company to file a deficient Proxy, which misrepresents and omits material information concerning (i) China XD's value (including as related to the Buyout Projections), (ii) potential conflicts of interest, and (iii) the process leading up to the Buyout.

8.     For these reasons, and as set forth herein, Plaintiffs seek to enjoin the vote on the Buyout (including Han or the Han SPV's right to vote on the Buyout) or the Buyout itself, or, if the Buyout closes, rescind the Buyout or recover post-close rescissory or actual damages.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over all the parties to this Action. Plaintiffs have submitted to the jurisdiction of this Court. Defendants are subject to this Court's jurisdiction because, among other things, China XD is a Nevada corporation, Merger Sub is a Nevada corporation which the Buyer Group recently formed solely to consummate the Buyout, and both the Merger Agreement and the Proxy state that "[a]ny legal proceeding arising out of or relating to the merger agreement or any of the transactions shall be brought and determined in the courts of the State of Nevada located in Clark County, Nevada . . . ." In short, Defendants have purposefully availed themselves of the protections of the forum state or have directed their activities toward the forum state such that they should expect to be subject to the Court's jurisdiction.

CLASS ACTION COMPLAINT

10.     Venue is proper because China XD's registered agent is located in Clark County, and the Merger Agreement designates Clark County as the appropriate court for adjudicating disputes arising out of the Merger Agreement.

## PARTIES AND RELEVANT NON-PARTIES

**I.     THE PLAINTIFFS**

11.     Plaintiff Zhong Hao Feng is, and has been at all relevant times, the owner of shares of common stock of China XD.

12.     Plaintiff Brian Burwell is, and has been at all relevant times, the owner of shares of common stock of China XD.

13.     Plaintiff Nellai Chockalingam is, and has been at all relevant times, the owner of shares of common stock of China XD.

14.     Plaintiff Bonmerc UG & Co. KG is, and has been at all relevant times, the owner of shares of common stock of China XD.

**II.     THE BUYER GROUP**

15.     Defendant Han co-founded the Company's chief operating subsidiary in 2003 and was appointed as its chairman in 2008. Han and his wholly owned Han SPV own 50.1% of the Company's total outstanding shares (including Common Stock and Series B Preferred Stock), which represents 69.6% of the Company's voting power.

16.     Defendant Han SPV is a business company incorporated under the laws of the British Virgin Islands. The Han SPV is wholly owned by Han.

17.     Defendant Holdco is an exempted company incorporated under the laws of the Cayman Islands. Holdco is wholly owned by Han, and its principal business is investment holding.

18.     Defendant Parent is an exempted company incorporated under the laws of the Cayman Islands and a party to the Merger Agreement. Parent is wholly owned by Holdco. Parent was formed solely for the purpose of entering into the Merger Agreement and the related financing agreements and consummating the transactions contemplated by such agreements.

CLASS ACTION COMPLAINT

19.     Defendant Merger Sub is a Nevada corporation, a signatory to the Merger Agreement, and a wholly-owned subsidiary of Parent. Merger Sub was formed solely for the purpose of entering into the Merger Agreement and consummating the transactions contemplated by such agreements.

20.     Defendants Han, the Han SPV, Holdco, Parent, and Merger Sub are collectively referred to as the Buyer Group.

## III.     THE ADDITIONAL INSIDE MANAGEMENT DIRECTOR

21.     Defendant Taylor Zhang ("Zhang") has served as the Company's Chief Financial Officer as well as a member of the Board since 2009. In its most recent annual proxy statement, filed with the SEC on January 14, 2020 (the "2020 Annual Proxy"), the Company admits that Zhang is not independent. According to the Proxy, Zhang owns 500,000 shares of China XD common stock.

## IV.     THE OUTSIDE DIRECTORS

22.     Defendant Huiyi Chen ("Chen") has served as a Board member since January 2, 2020. According to the Proxy, Chen owns zero shares of China XD common stock. Chen was a member of the Committee.

23.     Defendant Guanbao Huang ("Huang") has served as a Board member since January 2, 2020. According to the Proxy, Huang owns zero shares of China XD common stock.

24.     Defendant Linyuan Zhai ("Zhai") has served as a Board member since 2009. According to the Proxy, Zhai owns 10,879 shares of China XD common stock. Zhai was a member of the Committee.

25.     Han, Zhang, Chen, Huang, and Zhai are collectively referred to as the Board. Chen, Huang, and Zhai constitute the Committee and are collectively referred to as the "Outside Directors" The Buyer Group, Zhang, and the Outside Directors are collectively referred to as "Defendants."

## V.     RELEVANT NON-PARTIES

26.     Non-party China XD is a China-based Nevada corporation. After a series of complex transactions, and through various wholly-owned subsidiaries, China XD develops, manufactures, and sells polymer composite materials, primarily for automotive applications. China XD has two classes of stock issued and outstanding—common stock and preferred stock. As of the date of the

Merger Agreement, there were 66,948,841 shares of common stock issued and outstanding, and there were 1,000,000 shares of Series B Preferred Stock issued and outstanding, all of which were owned by the Han SPV. Each share of common stock is entitled to one vote on Company matters, while the Series B Preferred Stock shares are entitled in the aggregate to 44,632,561 total votes, representing approximately 40% of the Company's total voting power.

27.     Non-party MSPEA Modified Plastics Holding Limited ("MSPEA") is an affiliate of Morgan Stanley Private Equity Asia III, Inc. In 2011, MSPEA invested $100 million into China XD, acquiring 16,000,000 China XD preferred shares. In 2019, China XD exercised its rights pursuant to the 2011 investment agreement and converted MSPEA's preferred shares into 16,000,000 common shares, for which MSPEA had to pay an additional $100 million. In total, MSPEA, a sophisticated financial behemoth, thus paid $12.50 per common share for its interest in the Company, far more than the $1.20 per share Buyout price.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action on behalf of themselves and all owners of China XD common stock and their successors in interest, except Defendants and their affiliates (the "Class"). This action is properly maintainable as a class action for the following reasons.

29.     The Class is so numerous that joinder of all members is impracticable because China XD had millions of shares of common stock owned by thousands of different shareholders.

30.     Questions of law and fact are common to the Class, including whether:

a.      the Board members breached their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

b.      the Board members, in connection with the Buyout, pursuing a course of conduct that is in violation of their fiduciary duties;

c.      the members of the Buyer Group aided and abetted the Board members' breaches of fiduciary duty; and

d.      the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

31.     Plaintiffs' claims are typical of those of the other members of the Class.

32.     Plaintiffs are adequate representatives because they have no interests that are adverse to the Class, are committed to prosecuting this action, and have retained competent and experienced counsel.

33.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Moreover, Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## STATEMENT OF FACTS

**I.      OVERVIEW OF CHINA XD AND ITS FINANCIAL OUTLOOK**

34.     China XD is a specialty chemical company engaged in the research, development, manufacture, and sale of modified plastics.

35.     The Company's origins date back several decades, and current-day China XD is the result of a series of complex corporate transactions involving numerous direct and indirect subsidiaries and affiliates. The following sets forth China XD's structure as of December 31, 2019:

8

CLASS ACTION COMPLAINT

Group Structure of China XD Plastics Company Limited (December 31, 2019)

36.  China XD's primary end-market is the Chinese automotive industry, which has grown rapidly for the past few years where the Company's modified plastics are used by customers to fabricate a variety of different interior, exterior, and functional auto components such as air conditioning casing, heating and ventilation casing, engine covers, and air ducts.

37.  The Company's specialized plastics are utilized in more than 31 automobile brands manufactured in China, including leading brands such as Audi, Mercedes Benz, BMW, Toyota, Buick, Chevrolet, Mazda, Volvo, Ford, Citroen, Jinbei, and VW.

38.  China XD has three manufacturing bases in Harbin, Heilongjiang, and one manufacturing base in Nanchong, Sichuan Province. It also operates a manufacturing base in Dubai, UAE.

39.  In its most recent annual report filed with the SEC on June 1, 2020, on a Form 10-K (the "2019 Annual Report"), China XD described the growth potential in the markets it serves:

> According to a research report prepared exclusively for the Company and issued by Frost & Sullivan in 2020, China is estimated to have consumed approximately 25.3 million Metric Tons ("MT") of modified plastic products in 2019, representing an increase of 6.3% compared to 2018. With China being the world's leading manufacturing center and with rising domestic individual consumption, we believe

9

CLASS ACTION COMPLAINT

that demand for modified plastics from China will continue to increase in the foreseeable future. As shown in Figure 1, the market demand for modified plastics will reach 33.2 million MT in 2023, representing compound annual growth rates ("CAGR") of 7.0% and 6.0% by sales volume and revenues from 2019 to 2023. Currently, demand for our products is primarily driven by the Chinese automotive industry. In order for plastics to be used in automobile parts and components, they must satisfy specific physical criteria in terms of mechanical functionality, stability under light and heat, durability, flame resistance, and environmental friendliness. Modified plastics are usually found in interior materials, door panels, dashboards, mud flaps, chassis, bumpers, oil tanks, gas valves, grilles, unit heater shells, air conditioner shells, heat dissipating grids, wheel covers, and other components.

40.     China XD also disclosed two charts demonstrating the steady growth within the Chinese Modified Plastics Market from 2013 through 2023E:



41.     The Company cites numerous factors underlying the growth trajectory, including pro-environment and fuel economy trends and shifts toward plastic and away from historical use of metals in automotive applications, rising personal income driving automotive industry growth, improved vehicular safety and performance through use of plastics, and extensive government-backed programs to increase automobile production and consumption. All these policies suggest that, in addition to general, omnipresent growth drivers, numerous specific factors will drive even further growth in China XD's relevant markets.

42.     The Company has also stated in the 2019 Annual Report:

a.     "We believe the growth momentum in China's auto sales will remain strong over the next four years."

b.     "The automotive industry in China is still in its infancy . . . ."

c. "The significant gap of automobiles ownership per 1,000 people among China, United States and Europe indicates that the Chinese auto industry is still of huge growth potential."

d. "With the continuous development of Chinese auto manufacturing industry and expansion of auto consumption market, the parc of automobiles increased from 126,830.0 thousand units in 2013 to 231,220.0 thousand units in 2018 at a CAGR of 12.8%. It is expected that the number will keep growing and hit a record of 311,593.4 thousand units in 2023, with a CAGR of 5.7% during the period from 2019 to 2023."

43. Moreover, regarding plans to meet ever-growing demands, the Company said:

Over the past five years, we have consistently increased production capacity to meet the rising demands of the automotive industry in the PRC. As of December 31, 2019, we have an installed annual production capacity of 394,200 metric tons in domestic production bases, and we have been operating at near full capacity since 2007. With the expected strong growth in the automotive modified plastics market of China, we expect that we will continue to experience strong demand from our customers. Therefore, we intend to continue to strategically increase our production capacity to meet customer demands from both expanded geographical locations and future downstream sector growth.

44. In addition to its automotive parts business, China XD is expanding to produce plastics for PPE that can be used in the wake of the COVID-19 pandemic. It is also currently expanding into 3D printing and biodegradable plastics. Thus, the Company is strongly positioned for substantial, long-term growth.

**II.   GIVEN CHINA XD'S STRONG POSITION, HAN TOOK ADVANTAGE OF THE PANDEMIC TO ACQUIRE THE COMPANY**

45. In 2009, China XD completed a reverse merger to become publicly traded in the U.S. Over the past decade, Han reaped substantial benefits at the expense of public stockholders, earning $21,623,799 in executive compensation awards, which amount is excessive in light of Han's ownership of the Company (and thus his ability to secure a return on his investment in lieu of lavish compensation arrangements) as well as the $40,660,544.40 total Buyout price allocable to the

Company's public shareholders. Indeed, it is unreasonable for Han to have paid himself executive compensation amounting to roughly half of the Buyout price.

46.     After having enriched himself at the expense of the Company's shareholders, Han decided he wanted to take China XD private again so that he could control the Company's affairs without the nuisance of having to satisfy his fiduciary duties or comply with the federal securities laws.

47.     Han's first overt attempt to take the Company private came in 2017.

48.     On February 16, 2017, Han, the Han SPV, and MSPEA formed a consortium and submitted a preliminary, non-binding letter to the Board, proposing to acquire all of the Common Shares of the Company not already owned by the consortium at $5.21 per share in cash in a take-private transaction. Notably, Han said that he would not move forward with a takeover unless it was approved by (i) a special committee of the Board and (ii) the vote of a majority of minority China XD's shares, *i.e.*, shares held by those other than Han, the Han SPV, and MSPEA.

49.     In response, the Board formed a special committee, which retained Duff to serve as its financial advisor.

50.     Investors roundly criticized the 2017 take-private offer. During a March 15, 2017, earnings call, Matthew Larson, an analyst and frequent participant on the Company's earnings calls, called the $5.21 per share offer "almost unconscionable." John Cooper, an industry analyst from Stuyvesant Capital, said the offer represented "pennies on the dollar." Another analyst, George Mayor, described the offer as "ridiculously low."

51.     The take-private offer remained on the table for many months, but Han, Duff, and the special committee did not take any meaningful steps to advance a potential deal for more than a year. In periodic earnings calls, China XD's management said that Duff was performing a valuation of the Company, yet neither the Company nor the Board disclosed anything in this regard. The ongoing informational vacuum gave rise to investor angst and pointed questions toward China XD's management, including the following exchange between Zhang and analyst John Cooper:

CLASS ACTION COMPLAINT

Q:     Hi, sorry, but Matt[hew Larson]'s question reminded me of something that I was concerned with. In the case that the going private offer doesn't go through, is there a plan B?

A:     I just say there is no plan B or C in place currently.

52.     By asserting that Han was not considering any alternatives to the proposed buyout, Zhang all but confirmed that a go-private transaction was the only end result for the Company.

53.     Investors continued to criticize the lack of transparency concerning the offer, as well as the clearly unfair process that was undertaken, suggesting that such conduct could lead to class action litigation. In the wake of such criticism, certain members of the special committee even resigned from the Board.

54.     Meanwhile, 2018 featured record investment by the Company into capital projects that would substantially increase the Company's manufacturing footprint and enable it to serve the world's and China's ever-growing need for complex plastics materials.

55.     On October 14, 2019, after the Company's share price fell from about over $3 per share to under $2 per share, MSPEA withdrew from the consortium and informed the Board that it no longer intended to participate in the proposed transaction. Shortly thereafter, Han caused China XD to convert MSPEA's preferred stock into common stock, which had the effect of diminishing MSPEA's voting power.

56.     After MSPEA withdrew from the process, Han continued to consider buying the rest of the Company. To that end, he periodically reviewed the Company's business operations, the general conditions of the Chinese economy, the Company's industrial sector, and generally assessed strategic alternatives, including a going private transaction.

57.     In early 2020, the COVID-19 pandemic struck, plaguing businesses and financial markets worldwide. In China, where the Company does most of its business, GDP declined by 6.8% in the first quarter of the year, the biggest contraction since quarterly GDP records began. Chinese stock prices likewise dropped. The International Monetary Fund, in its April 2020 report, projected a global growth rate of −3% in 2020. (The lowest global growth rate during the 2007–09 global

CLASS ACTION COMPLAINT

financial crisis was recorded as −1.7% in 2009). America's S&P500 Index also dropped by 22% from January 21, the day the first case was reported in the USA, until March 31, 2020.

58.    The most commonly used indicator for volatility—and therefore financial anxiety—is the VIX, which also closed at an all-time record high, even higher than during the 2009 financial crisis. Han took advantage of the unprecedented market-wide angst to the detriment of China XD's minority shareholders.

59.    China XD's stock price also disappointed, losing half its value over the first quarter.



60.    By the end of the quarter, however, China's economy had already begun to show signs of a major recovery, and the Company, in particular, started to increase capacity again as administrative and factory employees returned to work.

61.    Han nevertheless saw the temporary stock drop and general investor wariness as a golden opportunity to acquire the shares of China XD he didn't already own at a bargain basement price. The Proxy, in fact, expressly acknowledges that Han began "seriously consider[ing]" the Buyout in April 2020. The Proxy further admits that the impact of the COVID-19 pandemic was one of the "primary factors that influenced [Han's] consideration of strategic alternatives." Han continued to evaluate the business throughout the rest of April and into the beginning of May 2020.

### III.  THE BOARD AGREES TO THE BUYOUT AFTER A TRUNCATED AND DEFICIENT PROCESS

62.     Whenever a company's board of directors decides to sell a company, the board has a fiduciary duty to maximize shareholder value. In connection therewith, directors must implement a process that is designed to secure the highest possible price. Here, however, the Board completely failed to maximize shareholder value.

63.     On May 8, 2020, the Buyer Group submitted an offer to acquire China XD's remaining outstanding shares for $1.10 per share. Unlike before, the Buyer Group did not condition the Buyout on minority shareholder approval, which shows that Han was willing to disregard the views of independent shareholders in order to seize control of the Company.

64.     On May 10, 2010, the Board met telephonically to discuss the Buyer Group's offer and resolved to form the Committee, consisting of three directors, Zhai, Chen, and Huang. The Committee was purportedly imbued with broad authority, including to solicit interest from other potential acquirers. Yet as alleged herein, the Committee never even entertained reaching out to any other potential acquirers.

65.     Later the same day, the Committee met telephonically and, among other things, decided to engage Duff as its financial advisor. The Proxy fails to disclose, however, how the Committee came to select Duff versus other potential financial advisors, whether Duff or any other potential advisor provided any presentation materials to the Committee to facilitate its decision-making process, and whether the Committee's members had any prior connections with Duff.

66.     On May 18, 2020, the Committee discussed logistics of the process and authorized Duff to commence due diligence on the Company to inform its eventual financial analyses regarding the Buyout. The Committee's due diligence authorization reflects that neither the Committee members nor Duff had any prior knowledge as to China XD's value, which is especially concerning given that Duff had purportedly already worked as a financial advisor in connection with Han's 2017 take-private offer. Moreover, as set forth below, Duff never actually conducted any meaningful "due diligence."

67.     On May 21, 2020, Duff held a telephonic meeting with Han and his counsel, during which Han confirmed the inevitability of the Buyout. The Proxy expressly states that Han said "he would neither sell his shares in the Company nor participate in any alternative transaction."

68.     On May 25, 2020, the Committee met again, during which Duff said it had still not received the Company financial projections it needed in order to begin assessing the financial fairness of the $1.10 per share offered by the Buyer Group. Moreover, despite being granted broad powers, the Committee affirmatively decided not to reach out to other potential buyers. The Committee's legal counsel also advised that the operative draft of the Merger Agreement did not contain a "majority of the minority" vote requirement. The Committee unreasonably failed to insist on such a voting requirement.

69.     Meanwhile, on June 1, 2020, the Company filed its 2019 Annual Report, announcing its financial results for the fourth quarter and fiscal year ended December 31, 2019. For the year, China XD reported revenue of $1,448.2 million, an increase of 13.6% from $1,274.8 million for the full year 2018. The Company also reported increases in gross profit, and gross profit margin. In the press release announcing the results, the Company stated:

> "Since the second quarter of 2019, we have achieved revenues by increased sales of new categories of higher-end products of PA66 and PA6 produced with high-priced raw materials with higher selling price in domestic market; and sales of high-priced semi-finished goods in domestic market to accelerate inventory turnover and replenish operating funds. We are pleased to see an overall increase of 45.9% in the average RMB selling price of our products, partially offset the decreased sales volume of 18.8% for the year ended December 31, 2019. At the same time, the Company has achieved a rapid increase of customer orders in non-automobile applications, evidenced by our stable sales growth in several domestic regions."

                    *       *       *

> "We will continue to optimize our management structure and enhance our operating efficiency. And we are confident, through our cooperation with Chinese big banks to succeed Company's expansion strategy in multiple regions and sectors, and to be confident with our core market positioning and expanded platform for growth." Mr. Han concluded.

70.     In addition to the Company's positive statements about the general state of its business, China XD made specific representations showing that it has successfully weathered the

CLASS ACTION COMPLAINT

COVID-19 pandemic. The 2019 Annual Report explained that China XD said it had to "temporarily close[] [its] manufacturing facilities and corporate offices" in early 2020 "in accordance with the requirement of the Chinese government . . . ." Nevertheless, the 2019 Annual Report stated that 90% of the Company's administrative employees had returned to work by the end of April 2020, and by the end of May 2020 its factories had attained "normal utilization rate . . . ." China XD's factory in Dubai was not impacted by the outbreak of COVID-19 during January and February.

71.    On June 4, 2020, the Committee met to discuss a variety of issues, but it does not appear from the Proxy that Duff provided any financial analyses regarding China XD's intrinsic value. Thus, although the Committee directed Duff to seek an unspecified price increase, it had no understanding regarding what the Company was worth.

72.    On June 14, 2020, the Buyer Group increased its offer by $0.10, to $1.20 per share. During this time, the parties had also been exchanging drafts of the Merger Agreement, indicating the Buyout was already by this time a foregone conclusion.

73.    On June 15, 2020, the Committee met to accept the Buyer Group's $1.20 per share offer, and at the same meeting Duff gave the Committee a financial "fairness" presentation regarding the Buyout. There is no indication of how much time, if any, the Committee devoted to analyzing Duff's report.

74.    Despite the important role the presentation played in the Board's eventual approval of the Buyout—paid-for "fairness opinions" are de facto requirements for any transaction no matter how unfair the price actually is—Duff's presentation was unreliable on its face.

75.    Duff's presentation, attached as an exhibit to the Schedule 13E-3 filed with the SEC on June 22 and September 9, 2020, expressly disclaimed any responsibility for the accuracy of the information contained in its presentation. Moreover, although Duff relied on the Buyout Projections for the basis of its opinion, Duff expressly disclaimed having any knowledge as to the accuracy of the information. Duff stated that it "did not independently verify" the information in the projections and, instead, offered a blanket disclaimer: "The information utilized in preparing this presentation was obtained from the Company and from public sources under the assumption that they are

CLASS ACTION COMPLAINT

complete and accurate as of the date of provision." Duff's presentation elsewhere further admitted that it accepted certain materials from China XD's management (namely, Han), without question or reservation about their accuracy. Specifically, Duff's presentation stated that it received "[a] detailed financial projection model for the Company" and that it "relied" on this model "in performing its analysis."

76.    Duff unreservedly relied on the Buyout Projections despite both (i) Han's clear incentive to provide Duff with artificially low forecasts to secure the lowest deal value possible and (ii) Duff's prior representation to the Committee that it would conduct "due diligence" on the Company. Indeed, the Committee and the Buyer Group were adversarial vis-à-vis the Buyout, and the Proxy's admission that "the management of the Company [*i.e.*, Han] prepared and made available certain financial projections . . . for purposes of preforming [sic] the financial analyses and [fairness] opinion" underscores the unreliability of the projections Duff received. Given China XD's recent entry into certain financing arrangements, which would have required the Company to produce financial projections as part of lenders' own due diligence process, Han's admission that the Buyout Projections were created solely for Duff's fairness analyses confirms that Han maintained different projections for his own financial planning purposes as well as in connection with any Company borrowing. These alternative sets of projections have not been disclosed.

77.    Despite the numerous reasons not to rely on the Buyout Projections, Duff blindly used these and other figures to perform various financial analyses regarding the Buyer Group's $1.20 per share offer. Based on its flawed analyses, Duff told the Board that the Buyout was fair, "from a financial point of view," to China XD's minority stockholders.

78.    On the same date that Duff presented its conclusion regarding value, the Committee summarily voted to accept Han's offer, and the full Board—which included both Han and Zhang—resolved to authorize China XD to enter into the Merger Agreement with Parent and Merger Sub.

CLASS ACTION COMPLAINT

## IV.    SUMMARY OF THE MERGER AGREEMENT

79.    On June 15, 2020, China XD announced that it had entered into the Merger Agreement with Parent and Merger Sub, pursuant to which Han, through Parent and Merger Sub, would acquire all the outstanding shares that Han does not already own for $1.20 per share.

80.    As the press release specifies:

Subject to the terms and conditions of the Merger Agreement, at the effective time of the merger, Merger Sub will merge with and into the Company, with the Company continuing as the surviving corporation and a wholly-owned subsidiary of Parent (the "[Buyout]"), and each of the Common Shares issued and outstanding immediately prior to the effective time of the [Buyout] will be cancelled and cease to exist in exchange for the right to receive the Merger Consideration of US$1.2 per share in cash, without interest and net of any applicable withholding tax, except for (i) Common Shares and Preferred Shares held by any of Parent, Merger Sub, the Rollover Stockholders and any of their respective affiliates; (ii) Common Shares held by the Company or any its wholly owned subsidiary (or held in the Company's treasury), and (iii) Common Shares reserved (but not yet allocated) for issuance, settlement and allocation upon exercise or vesting of the Company share awards.

81.    The Buyout requires an affirmative vote of the holders of at least a majority of the voting power of the common and preferred shares.

82.    Absent judicial intervention, because Han already controls a majority of China XD's voting power, including from all the preferred shares, shareholder approval of the Buyout is a foregone conclusion. Han did not agree to condition the approval of the Buyout on a majority vote of the unaffiliated shareholders.

83.    On September 30, 2020, China XD filed the Proxy, which announced that the shareholder vote on the Buyout would occur on November 5, 2020 at 9:00 a.m. (Beijing Time), which is equivalent to November 4, 2020 at 8:00 p.m. U.S. Eastern Standard Time.

84.    The press release announcing the Buyout stated, "Pursuant to Nevada Revised Statutes 92A.390(1), there are no rights of dissent available to the holders of Common Shares in connection with the Buyout." Moreover, "If completed, the [Buyout] will, under laws of the State of Nevada, result in the Company becoming a privately-held company and the Common Shares of the Company would no longer be listed on the NASDAQ."

CLASS ACTION COMPLAINT

## V.   THE BUYOUT OFFERS INADEQUATE CONSIDERATION TO CHINA XD'S PUBLIC SHAREHOLDERS

85.     After sanctioning a deficient process, the Board further breached its duties by accepting inadequate consideration for China XD's shares. The Company is worth far more than the $1.20 per share they stand to receive.

### *The Buyout Price Omits $62.8 Million in Receivables*

86.     First, the Company's purported balance sheet materially undervalues the Company's assets because it improperly omits a $62.8 million receivable from a longstanding customer. Although the Company claims that the $62.8 million was written off as a "doubtful account," the Company's own public statements in recent earnings calls demonstrate that the Company expected to receive the payment in the near future (if it hasn't already). An analyst and frequent participant on the Company's earnings calls highlighted the concern during the June 1, 2020, earnings call:

> The glaring problem is, of course, the large uncollectible, as you call it, billed for some customer in the UAE. All right? You must have known that was uncollectible during the fourth quarter. And that actually in December is when you were able to close on the very, very important financing. So, the banks were willing to lend you money for the first time, these state-owned enterprise banks, even though they knew that there was supposedly some sort of collection problem. So, to me, that's a one-off event.

> [discussion in foreign language ensued.]

> But it sounds to me you're going to collect it. So, you're going to write that loss back up this year. All right? So, by a one-off event, you just dumped it into the fourth quarter. And the numbers look worse than they are because you're going to be able to recoup that and put it back on as an income item for this year. And the banks lent you the money knowing that, and that's the critical thing because they wouldn't be lending you money for the first time if you were showing some sort of shortfall of that magnitude. But your revenues grew dramatically. Your EBITDA was still very strong.

87.     The Company, therefore, wrote off the $62.8 million to present, falsely, a lower asset base and attempt to justify an inadequate Buyout price. The Duff fairness opinion is premised on, among other erroneous facts, the false claim that the $62.8 million is not likely to be collected. Duff did not opine that the Buyout price would be fair if that material asset remained on the balance sheet. The $62.8 million that China XD expects to receive from a major Middle East customer should have been, but was not, reflected in the Buyout price.

*The Buyout Projections Incorporate Numerous False Assumptions Regarding the Company and Materially Understate China XD's Prospects*

88.    The Buyout price is also inadequate because it was based on a false premise concerning China XD's long-term value, as reflected by the misleading Buyout Projections Han gave Duff so Duff could render a "fairness opinion" regarding the $1.20 per share Buyout price.

89.    The Buyout Projections were summarized in the Proxy as follows:

| Company Financial Projections | | | | | | |
|---|---|---|---|---|---|---|
| | Fiscal Year Ending December 31, | | | | | |
| | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
| | (in RMB million except percentage) | | | | | |
| **Net Revenues** | 6,075 | 8,810 | 8,718 | 12,990 | 17,719 | 20,323 |
| **Gross Profit** | 606 | 880 | 871 | 1,784 | 2,843 | 3,463 |
| *% Margin* | *10.0%* | *10.0%* | *10.0%* | *13.7%* | *16.0%* | *17.0%* |
| **Operating Expenses** | 589 | 773 | 779 | 979 | 1,281 | 1,469 |
| **Income from Operations** | 17 | 107 | 92 | 805 | 1,562 | 1,994 |
| *% Margin* | *0.3%* | *1.2%* | *1.1%* | *6.2%* | *8.8%* | *9.8%* |
| **Depreciation and Amortization** | 805 | 1,276 | 1,330 | 1,355 | 1,400 | 1,444 |
| **EBITDA** | 823 | 1,383 | 1,422 | 2,159 | 2,962 | 3,437 |
| *% Margin* | *13.5%* | *15.7%* | *16.3%* | *16.6%* | *16.7%* | *16.9%* |
| **Net Income** | -476 | -546 | -666 | -16 | 522 | 833 |
| *% Margin* | *-7.8%* | *-6.2%* | *-7.6%* | *-0.1%* | *2.9%* | *4.1%* |

90.    The Schedule 13E-3 offers a more detailed (yet hardly legible) picture:

CLASS ACTION COMPLAINT

# Valuation Analysis
## Historical and Projected Financial Performance

*Historical and Projected Financial Performance*
*(RMB in thousands)*



*Note: Financial performance metrics presented are adjusted to exclude public company costs and non-recurring income and expenses.*
*Source: Company filings, the management of the Company*

91.  The Schedule 13E-3 also lists general assumptions for the Buyout Projections:

**Discounted Cash Flow Key Assumptions**

- Duff & Phelps utilized and relied upon the Management Projections for the fiscal years ending December 31, 2020 through 2025 (excluding public company expenses, as provided by the management of the Company), discussions with Company management, and a review of the Company's historical performance and other factors to develop the DCF analysis.

- Beyond the projection period, Duff & Phelps estimated the "terminal value" using a perpetuity formula.

- Duff & Phelps discounted the resulting free cash flows and terminal value using a weighted average cost of capital range of 13.50% to 14.50%, derived from the Capital Asset Pricing Model. Duff & Phelps also considered the higher risk profile of the pre-revenue biodegradable plastics business in its determination of the appropriate discount rate range for the Company.

- The following is a summary of the Management Projections utilized in the discounted cash flow analysis:

  - Net revenue increases at a compound annual growth rate ("CAGR") of 12.6% from 2019 to 2025.

  - EBITDA margin averages 16.5% from 2020 to 2025.

  - Capital expenditures average 16.7% of net revenue from 2020 to 2025.

  - Net working capital averages 52.6% of net revenue from 2020 to 2025.

92.  In the summary of Duff's DCF analysis, the Schedule 13E-3 similarly discloses a substantively similar set of financial projections:

CLASS ACTION COMPLAINT

**Discounted Cash Flow Analysis**
*(RMB in thousands)*

| | LTM | 2020P | 2021P | 2022P | 2023P | 2024P | 2025P | Terminal Year |
|---|---|---|---|---|---|---|---|---|
| Net Revenue | ¥8,724,733 | ¥6,074,853 | ¥8,809,875 | ¥8,717,699 | ¥12,989,674 | ¥17,718,922 | ¥20,322,899 | ¥20,322,899 |
| Growth | 2.8% | (39.2%) | 45.0% | (1.0%) | 49.0% | 36.4% | 14.7% | |
| EBITDA | ¥1,226,161 | ¥867,697 | ¥1,426,352 | ¥1,463,533 | ¥2,237,011 | ¥3,040,045 | ¥3,514,918 | ¥3,514,918 |
| Margin | 14.1% | 14.3% | 16.2% | 16.8% | 17.2% | 17.2% | 17.3% | 17.3% |
| Growth | 11.8% | (38.5%) | 64.4% | 2.6% | 52.9% | 35.9% | 15.6% | |
| | | 2020 Q2-Q4 | | | | | | |
| Earnings Before Interest and Taxes | | 2,688 | 142,738 | 126,329 | 874,579 | 1,631,974 | 2,063,591 | 2,922,895 |
| Pro Forma Taxes | | 0 | 0 | 0 | (73,677) | (161,212) | (211,807) | (340,703) |
| Net Operating Profit After Tax | | 2,688 | 142,738 | 126,329 | 800,902 | 1,470,762 | 1,851,784 | 2,582,192 |
| Depreciation | | 706,493 | 1,270,794 | 1,324,383 | 1,349,611 | 1,395,251 | 1,438,507 | 579,203 |
| Amortization | | 11,268 | 12,820 | 12,820 | 12,820 | 12,820 | 12,820 | 12,820 |
| Capital Expenditures | | (3,799,746) | (1,671,742) | (830,906) | (402,300) | (531,568) | (609,687) | (609,687) |
| (Increase) / Decrease in Working Capital | | 2,572,270 | (1,900,692) | (214,015) | (2,561,122) | (3,394,334) | (1,509,156) | (421,375) |
| Free Cash Flow (1) | | -¥507,027 | -¥2,146,082 | ¥618,612 | -¥800,178 | -¥1,047,068 | ¥1,184,268 | ¥2,143,153 |

| Enterprise Value Range | Low | High |
|---|---|---|
| Terminal Growth Rate | 4.00% | 4.00% |
| Weighted Average Cost of Capital | 14.50% | 13.50% |
| **Concluded Enterprise Value** | **¥6,830,000** | **¥8,270,000** |

**Implied Valuation Multiples**

| | | Low | High |
|---|---|---|---|
| EV / LTM EBITDA | ¥1,226,161 | 5.6x | 6.7x |
| EV / 2020 EBITDA | ¥867,697 | 7.9x | 9.5x |
| EV / 2021 EBITDA | ¥1,426,352 | 4.8x | 5.8x |
| EV / 2022 EBITDA | ¥1,463,533 | 4.7x | 5.7x |
| EV / LTM Revenue | ¥8,724,733 | 0.78x | 0.95x |
| EV / 2020 Revenue | ¥6,074,853 | 1.12x | 1.36x |
| EV / 2021 Revenue | ¥8,809,875 | 0.78x | 0.94x |
| EV / 2022 Revenue | ¥8,717,699 | 0.78x | 0.95x |

(1) Prior to application of 10% dividend withholding tax, which is calculated based on levered cash flows and discounted separately at the cost of equity derived in the WACC calculation and included in the concluded enterprise value range.

Note: Balance sheet data and LTM as of March 31, 2020. Financial performance metrics presented are adjusted to exclude public company costs and non-recurring income and expenses.

93.   Regardless of how presented, the Buyout Projections offer an objectively unsupportable and overly pessimistic view of China XD's long-term prospects.

94.   The Buyout Projections are already facially unreliable because they came *not* from any ongoing long-term financial planning conducted by China XD's management but, rather, from a self-interested executive whose primary concern was paying as little as possible to acquire the Company.

95.   Numerous additional factors further demonstrate that the Buyout Projections painted a materially misleading and unreasonably pessimistic view of the Company's long-term prospects.

96.   First, the Buyout Projections assume that China XD's capital expenditures will average 16.7% of net revenue from 2020 through 2025. The Buyout Projections also show that the Company will record almost RMB 4 billion in capital expenditures for 2020 alone, which translates to approximately $586,183,640 or 52.6% of the Company's projected net revenue for the same period.

CLASS ACTION COMPLAINT

97.     This estimate is utterly unsupportable, as the Company has never in its entire history recorded anywhere close to that amount in annual capital expenditures, and the amount far exceeds China XD's ordinary level of capital expenditures over the past five years.

|  | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|
| Revenues | $999,192,894 | $1,201,678,898 | $1,290,447,748 | $1,274,833,282 | $1,448,204,826 |
| CAPEX | $267,427,681 | $210,840,098 | $175,659,870 | $429,205,807 | $154,115,880 |
| CAPEX / Revenues | 26.8% | 17.5% | 13.6% | 33.7% | 10.6% |

98.     Notably, the Company did not provide any explanation for the materially inflated capital expenditure projections.

99.     Moreover, the high-water line of China XD's capital expenditures came in 2018, when the Company embarked on an aggressive expansion program that would substantially increase the Company's total manufacturing capacity. Those projects are largely complete, however, and the Company has not conveyed that it expects to spend anywhere close to 2018 levels in any public statements.

100.    Furthermore, China XD's quarterly report for the first half of 2020 represents that the Company spent only $24.5 million on capital expenditures through June 30, 2020. Thus, based on the Company's own public statements regarding, among other things, outstanding commitments from certain construction projects, China XD will not spend anywhere close to $586 million in capital expenditures for 2020.

101.    The assumptions regarding China XD's capital expenditures are patently absurd and were conjured to overstate the Company's projected expenses and, thus, understate the Company's value. Moreover, frontloading projected capital expenditures resulted in a lower implied valuation than if the Company had evenly spread projected expenditures over the projections period.

102.    Second, the Buyout Projections present materially false assumptions regarding the Company's net working capital. The Buyout Projections assume that China XD would maintain net working capital equivalent to 52.6% of the Company's net revenue. This too is belied by history.

CLASS ACTION COMPLAINT

From 2015 through 2019, the Company's net working capital as a percentage of net revenue ranged from -14.1% to 23.1%, not the ranges set forth in the Schedule 13E-3. By including inflated levels of net working capital in his projections, not only are the figures set forth in the Schedule 13E-3 materially false, but Han has also cast a misleading picture in which the Company would horde cash and refuse to deploy it for growth-generating uses. While the Chinese and global economy grows—as it is forecast to do—China XD, at least under the supposed net working capital assumptions, would remain largely idle for the next several years. That is a far-fetched scenario given the Company's substantial investment into its manufacturing capabilities over the past several years.

103.    The $1.20 per share Buyout price also fails to reconcile the oft-discussed fact that the stock market has perpetually undervalued China XD's stock, made even worse by the diminution in stock prices as a result of the COVID-19 pandemic. As observed during the November 14, 2019, earnings call, Zhang said, "The company has been undervalued over years." Several investors who have participated in the Company's period earnings calls have also decried the fact that China XD's stock is generally undervalued. Such undervaluation stems from, among other things, Han's persistent lack of transparency (including as related to the 2017 take-private offer as well as the dense web of affiliates and affiliated transactions the Company operates through), and the market's relative inability to value non-U.S. companies of a size similar to China XD,

### *The Recent Temporary Equity Transfer Undermines the Fairness of the Buyout*

104.    On January 22, 2020, according to China XD's report for the quarterly period ended March 31, 2020 (the "2020 Q1 10-Q"), for the equivalent of $45.9 million, an unnamed "third party investor" acquired 36.21% and 38.08% of the equity interest of the Company's two wholly owned Chinese subsidiaries, Heilongjiang Xinda Enterprise Group Company Limited and Sichuan Xinda Enterprise Group Company Limited.

105.    In other words, this "third party investor" spent more money to acquire less than 40% of just two of the Company's many subsidiaries—the 2019 Annual Report lists China XD has having 15 different subsidiaries—than China XD's independent stockholders will receive for Han to acquire the entire Company.

CLASS ACTION COMPLAINT

106.    Beyond its potential measure of the Company's overall value, the temporary equity transfer also appears to have been structured as such to drive down China XD's equity value. Indeed, Duff's financial analyses yielded "enterprise values" for the Company, which then have to be translated to "equity value" in order to arrive at a per share value. In addition to considering debt, cash, and cash equivalents, the enterprise-to-equity value calculation requires the subtraction of "non-controlling interests," including the type reflected by the $45.9 investment in the Company's two Chinese subsidiaries. In other words, even though the January 22, 2020, transaction is akin to a loan, it was structured as an equity investment to drive down the resulting calculation of equity value by $45.9 million. Han's causing the Company to enter into the sham equity transfer, in and of itself, represents a breach of fiduciary duty.

*The Company's Public Statements and Recent Business Activities and Stock Performance Demonstrate the Inadequacy of the $1.20 Per Share Buyout Price*

107.    Further, as alleged above, the Company's own public statements indicate that China XD is poised for success. It boasts a massive manufacturing footprint, has successfully weathered the difficult business conditions stemming from the COVID-19 pandemic, and operates in a market that is expected to enjoy immense expansion over the next several years, and has recently invested substantial sums of money to expand its manufacturing capacity and expects to operate more efficiently (and thus more profitably) than ever before.

108.    China XD's recent, post-signing periodic financial reporting further demonstrates that the business is on solid footing and that it is primed for substantial long-term growth.

109.    On June 29, 2020, China XD announced its financial results for the first quarter ended March 31, 2020. The Company observed declines in various metrics compared to the same period from the prior year, yet Han assured the market of China XD's progress:

"Due to the COVID-19 pandemic, China's auto industry was hit hard with production and sales decreased by 45.2% and 42.4%, respectively for the first quarter of 2020. The Company's manufacturing facilities in Harbin and Sichuan were temporarily shut down in February and March 2020 while our Dubai facilities' operation has been suspended since early February 2020, pursuant to the local government directives. During the first quarter of 2020, the Company's revenue decreased by 52.0%, and our domestic sales decreased by 51.1% in all regions, as compared to the same period

26
CLASS ACTION COMPLAINT

of the last year. The Company has taken proactive measures to respond to these changes from the supply disruption and the decreased orders of auto industry. We continued to promote sales of high-priced semi-finished goods in domestic market during the first quarter of 2020. We are pleased to see an overall increase of 65.6% in the average RMB selling price of our products, to partially offset the decreased sales volume of 70.0%. "

"Meanwhile, China XD has responded to the COVID-19 pandemic by producing raw materials for PPE such as goggles and masks, to help alleviate the pandemic to our communities and mitigate the negative impact of world pandemic on Chinese auto industry."

"We also resumed our commitment to completing our industrial project for upgrading existing equipment for 100,000 metric tons of engineering plastics by the end of third quarter of this year, and our Qinling Road Project and Jiangnan Road Project for equipment upgrade and factory revamping by the end of the fourth quarter of 2020, thus bringing the production capacity in Heilongjiang Campus back to 390,000 metric tons. At the same time, we expect to complete additional 10 production lines in our Sichuan plant by the end of the fourth quarter of this year, thus to bring the total capacity of Sichuan base to 300,000 metric tons. Together with the production capacity ramp up in Dubai, we are confident in our ability to make further inroads into more specialized high-end products for various applications in more other markets"

"We will continue to optimize our management structure and enhance our operating efficiency. We are confident, through our cooperation with Chinese big banks to successfully execute our expansion strategy in multiple regions and sectors, and to be confident with our core market positioning and expanded platform for growth." Mr. Han concluded.

110.   On August 14, 2020, China XD announced its financial results for the second quarter ended June 30, 2020. Although the Company's results represented a decline over the prior year's second quarter, Han explained performance was solid in light of the pandemic:

"We are pleased with our quarterly results with recovery in both top and bottom lines." said Jie Han, Chairman of the Board of Directors and Chief Executive Officer. "During the first half of this year, we have witnessed severe disruption in both production and sales of China's auto industry, and the production and sales in the first half of this year showed a year-on-year decline, as the result of the COVID-19 pandemic. Amid the negative economic and industry environment, during the three-month period ended June 30, 2020, China XD proactively fine-tuned its marketing strategy to promote sales of new categories of higher-end products of PA66 and PA6 produced with high-priced raw materials with higher selling price in domestic market. This was evidenced by sales growth in Southwest China, East China and South China, and average RMB sales price increased by 19.7%, partially offset the decreased sales volume of 47.0%. "

"Along the Chinese government recently issued supportive policies toward enterprises reopening, we will continue to focus on our customers' need, synchronize our production and sales to pursue stable sales increase. At the same time, we will continue to complete our infrastructure projects in Heilongjiang and Sichuan campus as planned, thus bringing the production capacity in Heilongjiang Campus back to

390,000 metric tons and bringing the total capacity of Sichuan base to 300,000 metric tons by the end of 2020. We are confident in our ability to make further inroads into more specialized high-end products for various applications in more other markets."

"We will continue to optimize our management structure and enhance our operating efficiency. We are confident, through our cooperation with Chinese major banks to successfully execute our expansion strategy in multiple regions and sectors, and confident with our core market positioning," Mr. Han concluded.

111.    Accordingly, given the Company's recent strong performance, its positioning for growth, and analyst expectations, the Buyout undervalues the Company and is, therefore, inadequate.

112.    Indeed, the Company's own financials show the inadequacy of the offer price of $1.20 per share. The Company's shares were consistently traded above $2.00 per share throughout 2019 (above $2.80 per share at its peak), and the Company's tangible book value as of December 31, 2019 was approximately $836 million, or $12.41 per share—more than ten times the $1.20 per share which Han offered and the Board accepted.

113.    Further, the Company's financial results for the second quarter ended June 30, 2020 show that the Company's earnings per share in the quarter alone amounted to $0.26, over 20% of the offer price of $1.20 per share. In other words, an historically bad quarter resulted in quarterly revenues that, if extrapolated for an entire year, would approach the Buyout price, and the resulting roughly 1x multiple is so far beyond the range of acceptability that no director in good faith could authorize a deal based on these considerations.

### *The Lack of Dissenters' Rights Precludes an Independent Assessment of Fair Value*

114.    The inadequacy of consideration is further compounded by the unavailability of appraisal rights pursuant to Nevada's statutory corporate law, which precludes dissenters' rights for shareholders of a Company whose stock trades on a national exchange.

## VI.    THE PRECLUSIVE DEAL PROTECTION DEVICES

115.    The Buyout is a *fait accompli* because, absent judicial intervention, the Buyer Group has enough control over the Company to bring about the Buyout regardless of shareholder opposition given the Board's failure to insist on a "majority of the minority" voting condition. Relatedly, Han's majority control of the Company is likely to further deter any otherwise interested party. Han clearly

has an interest in acquiring the Company and has expressly stated that he will not consent to any other competing transaction, so it is extremely unlikely that any outside party would be able to develop a financial model for China XD.

116.    Yet the Board also agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Buyout even more preclusive.

117.    Section 6.2 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Han. This section also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers. If an unsolicited bidder submits a competing proposal, the Company must notify Han of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Han in order to enter into the competing proposal, it must grant Han four business days and allow Han to amend the terms of the Merger Agreement to make a counter-offer that the Board must consider in determining whether the competing offer still constitutes a superior proposal. In short, the Merger Agreement gives Han access to any rival bidder's information and allows Han a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Han.

118.    In addition, if the Board decides to pursue another offer, the Merger Agreement provides that China XD must pay the Buyer Group a termination fee, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

119.    Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or

CLASS ACTION COMPLAINT

would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

## VII. DEFENDANTS MISREPRESENTED AND OMITTED MATERIAL INFORMATION REGARDING THE BUYOUT

120. On September 30, 2020, China XD filed the Proxy with the SEC, which announced that the vote on the Buyout would occur on November 5, 2020 at 9:00 a.m. (Beijing Time), which is equivalent to November 4, 2020 at 8:00 p.m. U.S. Eastern Standard Time. Also on September 30, 2020, the Company filed a Schedule 13E-3, which contained a copy of Duff's presentation to the Board.

121. Directors and officers have a fiduciary obligation to disclose any and all material information concerning matters subject to stockholder approval, and they similarly are obligated to ensure that such disclosures are not false and misleading, whether by affirmative misrepresentation or omission of information that would render a representation not misleading.

122. Here, however, Defendants have breached their fiduciary duties by filing a Proxy that misrepresents and omits material information concerning the Buyout.

123. First, for the reasons explained above, the Proxy is false and misleading because it misrepresents the current status of China XD's business by failing to properly account for the $62.8 million the Company expects to receive from a long-term customer in the Middle East but has recorded as a "doubtful account[]."

124. Second, as also explained above, the Proxy is false and misleading because it inaccurately depicts the long-term prospects of China XD. The Proxy partially discloses the Buyout Projections, which the Company's management created and provided to Duff as purportedly representing management's views as to the Company's long-term prospects. But as stated above, these projections falsely present an overly negative view of the Company's future. Among other things, the Company grossly overstates expected capital expenditures and net working capital. Moreover, given the Company's recent investment in capacity expansion, as well as its foray into other areas like high-end products, biodegradable products, and medical-related products, the growth

assumptions underlying the Company's Buyout Projections are unreasonably pessimistic. The Proxy's presentation of objectively and subjectively false financial projections renders it materially misleading.

125.    Third, the Proxy Statement is also materially inadequate and misleading because it fails to disclose details underlying Duff's retention as the Committee's financial advisor, including Duff's prior role in advising the Board on Han's prior attempt to buy the Company, the nature of Duff's ongoing interactions with any members of the Board or of China XD's management, and the nature of the due diligence it purportedly conducted prior to providing a single presentation supporting its flimsy fairness opinion on the inadequate $1.20 per share.

126.    Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties

127.    **(Against the Outside Directors)**Plaintiffs repeats all previous allegations as if set forth in full herein.

128.    The Outside Directors, as directors of China XD, owe China XD's shareholders fiduciary duties of loyalty, due care, good faith, and full disclosure. As a result of their fiduciary duties, the Outside Directors were obligated to:

    a.    undertake an appropriate evaluation of China XD's net worth as a merger/acquisition candidate;

    b.    take all appropriate steps to enhance China XD's value and attractiveness as a merger/acquisition candidate;

    c.    act independently to protect the interests of the Company's public shareholders;

    d.    adequately ensure that no conflicts of interest exist between the Outside Directors' own interests and their fiduciary obligations, and, if such conflicts

exist, to ensure that all conflicts are resolved in the best interests of China XD's public shareholders;

e.    evaluate the Buyout and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of China XD; and

f.    disclose to China XD's shareholders any and all material information regarding the Buyout in a completely truthful manner.

129.    The Outside Directors have breached their fiduciary duties to Plaintiffs and the Class.

130.    As alleged herein, the Outside Directors have initiated a process to sell China XD that undervalues the Company. In addition, by agreeing to the Acquisition, the Outside Directors have capped the price of China XD at a price that does not adequately reflect the Company's true value. The Outside Directors also failed to sufficiently inform themselves of China XD's value, or disregarded the true value of the Company. Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that are committed to the Acquisition.

131.    As a result of the Outside Directors' breaches, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of China XD's assets and will be prevented from benefiting from a value-maximizing transaction.

132.    Unless enjoined by this Court, the Outside Directors will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Buyout, to the irreparable harm of the Class.

133.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duties

134.    **(Against the Buyer Group)**Plaintiffs repeat all previous allegations as if set forth in full herein.

135.    The Buyer Group, as China XD's controlling shareholder, owes China XD's shareholders fiduciary duties of loyalty, due care, good faith, and full disclosure.

136.     The Buyer Group has knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of China XD and have acted to put their personal interests ahead of the interests of China XD shareholders.

137.     As a result of the Buyer Group's breaches, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of China XD's assets and will be prevented from benefiting from a value-maximizing transaction.

138.     Unless enjoined by this Court, the Buyer Group's members will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Buyout, to the irreparable harm of the Class.

139.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT III
## Breach of Fiduciary Duties

140.     **(Against Defendants Han and Zhang)**Plaintiffs repeat all previous allegations as if set forth in full herein.

141.     Defendants Han and Zhang, as officers of China XD, owe China XD's shareholders fiduciary duties of loyalty, due care, good faith, and full disclosure.

142.     Defendants Han and Zhang, in their capacities as China XD's executive officers, were involved in the creation of the Company's financial projections, which Han and Zhang created with the specific purpose of enabling Duff to perform financial analyses regarding the consideration being offered by the Buyer Group.

143.     In connection with the Buyout, Defendants Han and Zhang devised and provided to the Board and Duff financial projections that misrepresented China XD's financial prospects.

144.     Defendants Han and Zhang conjured these unreasonable and unsupportable projections intentionally, recklessly, or grossly negligently.

145.     As a result of Han's and Zhang's breaches, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of China XD's assets and will be prevented from benefiting from a value-maximizing transaction.

CLASS ACTION COMPLAINT

1    146.    Unless enjoined by this Court, Han and Zhang will continue to breach their fiduciary

2    duties owed to Plaintiffs and the Class, and may consummate the Buyout, to the irreparable harm of

3    the Class.

4    147.    Plaintiffs and the Class have no adequate remedy at law.

5                              **PRAYER FOR RELIEF**

6         **WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as

7    follows:

8              (A)    declaring this action to be a class action and certifying Plaintiffs as the Class

9    representatives and their counsel as Class counsel;

10             (B)    enjoining, preliminarily and permanently, the Buyout;

11             (C)    in the event that the transaction is consummated prior to the entry of this

12   Court's final judgment, rescinding it or awarding Plaintiffs and the Class rescissory damages;

13             (D)    directing that Defendants account to Plaintiffs and the other members of the

14   Class for all damages caused by them and account for all profits and any special benefits obtained

15   as a result of their breaches of their fiduciary duties;

16             (E)    awarding Plaintiffs the costs of this action, including a reasonable allowance

17   for the fees and expenses of Plaintiff's attorneys and experts; and

18             (F)    granting Plaintiffs and the other members of the Class such further relief as

19   the Court deems just and proper.

20                              **JURY DEMAND**

21        Plaintiff demands a trial by jury.

22
     DATED: October 2, 2020                    Respectfully submitted,
23                                             THE O'MARA LAW FIRM, P.C.

24                                                  /s/ David C. O'Mara
                                             _____
25                                             DAVID C. O'MARA, ESQ.
                                               311 E. Liberty Street
26                                             Reno, Nevada 89501
                                               Tel.: 775.323.1321
27                                             Fax: 775.323.4082

28
                                    34
                          CLASS ACTION COMPLAINT

david@omaralaw.net

*Liaison Counsel for Plaintiffs*

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Alexandra B. Raymond
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7222

*Counsel for Plaintiffs*

35

CLASS ACTION COMPLAINT